STATE EX REL. STATE HIGHWAY COMMISSION, Relator, v. L. D. THOMPSON, STATE AUDITOR.—53 S. W. (2d) 273.

Court en Banc, October 5, 1932.

*John W. Mather* and *John C. Collet* for relator.

324

*Stratton Shartel,* Attorney-General, and *Edward G. Robison,* Assistant Attorney-General, for respondent.

HENWOOD, J.—This is an original proceeding in mandamus wherein relator seeks to compel respondent to register certain state

road bonds of the face value of $1,050,000, with the purpose of selling said bonds and of using the proceeds of the sale in purchasing three toll bridges across the Missouri River, one at Jefferson City, one between Independence and Liberty, and one at Hermann, for use as parts of certain state highways.

Respondent has filed his return to relator's petition, having waived the issuance of an alternative writ of mandamus, and relator has filed a motion for judgment on the pleadings.

It is admitted that the portion of U. S. Highway No. 63 extending from Rolla north and west to Jefferson City, thence across the Missouri River on a toll bridge, and thence north, through Columbia, to Moberly, has been designated as a higher type road; that a highway extending from Harrisonville north to Lees Summit, thence north, through or near Independence, to the Missouri River, thence across the Missouri River on a toll bridge, thence north to Liberty, and thence west to U. S. Highway No. 71, has been designated as Traffic Relief Road No. 35; that a toll bridge across the Missouri River at Hermann, which now connects the parts of State Highway No. 19 lying north and south of the Missouri River, has been designated as a part of 300 miles of new highways and bridges to be added to the state highway system, and as a part of Traffic Relief Road No. 100, which extends from Washington north and west to Herman, thence across the Missouri River, and thence north on State Highway No. 19 to U. S. Highway No. 40, near New Florence; that the State Highway Commission has made each of said designations, in good faith, with the purpose of purchasing said toll bridges for use as parts of said designated state highways; that the State Highway Commission has contracted for the purchase of the Jefferson City bridge for $150,000, for the purchase of the bridge between Independence and Liberty for $400,000, and for the purchase of the Herman bridge for $500,000, with the provision that the owners of said bridges shall accept in full payment therefor the proceeds derived from the sale of certain state road bonds of the face value of $150,000, $400,000 and $500,000, respectively; that certain state road bonds of the face value of $1,050,000 were duly issued for that purpose by the board of fund commissioners and presented in proper form to respondent for registration; and that respondent refused to register said bonds.

In defense of his refusal to register said bonds, respondent asserts that the State Highway Commission is without authority to include bridges across the Missouri River, a navigable stream, as parts of said designated state highways or to purchase said toll bridges across the Missouri River for use as parts of said designated state highways.

I. THE JEFFERSON CITY BRIDGE.—The constitutional Amendment of 1920 (original Sec. 44a of Art. IV of the Constitution, Laws

326

1921, p. 707) authorized a bond issue of $60,000,000 "for the purpose of constructing hard surfaced public roads in each county of the State." In Sec. 29 of the Centennial Road Law (Laws 1921, 1st. Ex. Sess., pp. 145-164, now Sec. 8120, R. S. 1929) the Legislature designated the routes of a state-wide connected system of state highways, and the last paragraph of said section provides "that the highway commission is authorized and empowered to designate the routes and types of the higher type roads of approximately 1500 miles connecting the principal population centers of the State, and to make such changes in the routes of said roads as it may deem necessary in the interest of economy and directness of routes, and is authorized to commence the construction of said higher type roads at such place or places on such routes as it may deem advisable. . . ."

In 1923 the State Highway Commission designated the portion of U. S. Highway No. 63 extending from Rolla north and west to Jefferson City, thence across the Missouri River on a toll bridge, and thence north, through Columbia, to Moberly, as one of such higher type roads, and has now completed the same, with the exception of a bridge across the Missouri River at Jefferson City.

In challenging the State Highway Commission's authority to designate a bridge across the Missouri River at Jefferson City. as a part of said higher type road, respondent points out that, in the route of said highway as designated by the Legislature in the Centennial Road Law, a gap was left therein between South Cedar City on the north side of the Missouri River, in Callaway County, and Jefferson City on the south side of the Missouri River, in Cole County. And, because Section 28 of the Centennial Road Law (Laws of 1921, 1st Ex. Sess., p. 145, now Sec. 8119, R. S. 1929) provides that "bridges and culverts over all nonnavigable streams . . . shall be regarded as part of the state highway," respondent argues that the framers of said law did not intend that a bridge over a navigable stream should be included as a part of any state highway.

It may be conceded that bridges over navigable streams were not originally intended to be included as parts of the state highways designated by the Legislature in the Centennial Road Law. But, manifestly, the express authority of the State Highway Commission, under said law, "to designate the routes and types of the higher type roads of approximately 1500 miles connecting the principal population centers of the State" carries with it implied authority to include bridges over navigable streams as parts of said higher type roads. The very purpose of said provision is to *connect* the principal population centers of the State with higher type roads along direct routes, and the construction of said provision for which respondent contends would

defeat that purpose, by leaving gaps in such highways at all points where the same are intersected by navigable streams.

■ Whether the State Highway Commission is authorized by the provisions of the Centennial Road Law to purchase the toll bridge across the Missouri River at Jefferson City for use as a part of said higher type road we need not decide, for the constitutional Amendment of 1928 (present Sec. 44a of Art. IV of the Constitution), as we view it, not only furnishes such authority, but, by implication, sweeps aside all provisions to the contrary, if any there are, in the Centennial Road Law.

Said constitutional amendment (in the first paragraph) authorizes an additional bond issue of $75,000,000 "for the purpose of locating, establishing, acquiring, constructing, widening and *improving hard-surfaced public highways in the State* and in each county thereof, and of acquiring materials therefor and for the purpose of *locating and constructing bridges across the rivers and waters of the State* and of participating in the construction of toll-free, interstate bridges;" and said constitutional amendment (in the third paragraph) specifically provides that the proceeds of said bond issue shall be expended under the direction and supervision of the State Highway Commission, in part, "*To complete* and widen or otherwise improve the state system of primary and secondary highways as designated and laid out under existing laws." (Our italics.) True, said constitutional amendment does not expressly authorize the State Highway Commission to purchase existing bridges. But, it has been held in cases involving public improvements that, under some circumstances, the general power to "construct" includes the power to "purchase." [See Seymour v. City of Tacoma, 6 Wash. 138; Ostrander v. City of Salmon, 20 Idaho, 153; Dick v. Scarborough, 73 S. C. 150.] Immediately after the adoption of the constitutional amendment of 1920, which authorized the expenditure of $60,000,000 in the construction of a state highway system, a dispute arose between the larger cities and the rural districts over a division of "the spoils," that is, a dispute as to what proportion of state road funds should be spent in the construction of higher type roads connecting the population centers of the State. Reflections of this dispute appear in the provisions of Section 26 of the Centennial Road Law (now Sec. 8117, R. S. 1929), relating to the apportionment of state road funds, and in other provisions of said law. However, the provisions of the constitutional Amendment of 1928 show that the larger cities and rural districts, with a better appreciation of the value of the state highway system and with the purpose of completing the same as speedily as possible, "got together" and agreed "to turn the state highway commission loose" with ample funds and ample authority for the accomplishment of that purpose.

So viewing the provisions of said constitutional amendment as a whole, we are led to the conclusion that its framers intended, by the general provision for the *construction* of "bridges across the rivers and waters of the State" and by the specific provision for the *completion* of existing state highways, to invest the State Highway Commission with authority to *provide* bridges over navigable streams at all points where such streams intersect said highways, either by *constructing* new bridges or by *purchasing* existing bridges at such points, and, therefore, we hold that said provisions should be so construed.

■   Obviously, the Legislature so viewed said constitutional amendment in 1929 when it enacted a new section (Laws 1929, p. 366, now Sec. 8111, R. S. 1929, in lieu of Sec. 21 of the Centennial Road Law, Laws 1921, 1st Ex. Sess., p. 141) which reads, in part, as follows:

"The State Highway Commission shall have the power to purchase, lease, or condemn, lands in the name of the state of Missouri for the following purposes when necessary for the proper and economical construction and maintenance of state highways: . . .

"(2) *Acquiring bridges* or sites therefor and ferries, including the rights and franchises for the maintenance and operation thereof, *over navigable streams,* at such places as the state highway commission shall have authority to construct, *acquire* or contribute to the cost of construction of *any bridge.*" (Our italics.)

Such legislative construction of said constitutional amendment shortly after the adoption of the latter is worthy of mention, at least, in support of a like construction by this court.

It should also be noted that the constitutional amendment of 1928 (in the third paragraph) provides for the reimbursement of "the various counties and political or civil subdivisions . . . of the State for money expended by them in the construction or *acquisition* of roads and *bridges* now or hereafter taken over by the State as permanent parts of the state highway system," and that, by new Section 8129, Laws 1931, p. 321, the State Highway Commission "may at such time or times as the road funds will justify without interfering with other state road construction or maintenance," reimburse any county or other civil subdivision of the State for *"any bridge* entirely within the state of Missouri *across any navigable stream,* that forms a segment or part of the state road system or any easement thereon," which such county or other civil subdivision "shall have constructed or *purchased* out of public funds." (Our italics.)   Did the framers of the constitutional Amendment of 1928 intend to say that the State Highway Commission may acquire a bridge over a navigable stream for use as a part of a state highway by reimbursing a county or other civil subdivision of the State therefor after such

county or other civil subdivision shall have *"purchased"* such bridge, but that the State Highway Commission cannot purchase such bridge from private owners? We think not.

■ II. THE BRIDGE BETWEEN INDEPENDENCE AND LIBERTY.—The constitutional Amendment of 1928 also provides (in the third paragraph) that the proceeds of said additional bond issue shall be expended under the direction and supervision of the State Highway Commission, in part, *"to construct other state highways and bridges,* and to widen or otherwise improve existing state highways and bridges *in the congested traffic areas adjacent to the cities of St. Louis and Kansas City;"* and said constitutional amendment further provides (in the fourth paragraph) that certain state road funds derived from other sources shall be expended under the direction and supervision of the State Highway Commission, in part, *"to construct and maintain other state highways and bridges* and to widen and otherwise improve existing state highways and bridges *in the congested traffic areas adjacent to the cities of St. Louis and Kansas City."* (Our italics.)

In pursuance of these provisions a highway extending from Harrisonville north to Lees Summit, thence north, through or near Independence, to the Missouri River, thence across the Missouri River on a toll bridge, thence north to Liberty, and thence west to U. S. Highway No. 71, has been designated by the State Highway Commission as Traffic Relief Road No. 35. It connects with U. S. Highway No. 71 at its starting point (Harrisonville), south of Kansas City, as well as at its terminus, north of Kansas City, and it intersects U. S. Highway No. 50 at Lees Summit, U. S. Highway No. 40 near Blue Springs, U. S. Highway No. 24 near Independence, and U. S. Highway No. 69 at Liberty. U. S. Highway No. 71 runs north and south across the extreme west side of this State, through Kansas City. U. S. Highway No. 50 and U. S. Highway No. 40 run east and west between Kansas City and St. Louis, the former south of the Missouri River and the latter north of the Missouri River between Boonville and St. Charles. U. S. Highway No. 24 runs northeast and southwest between Kansas City and Hannibal. U. S. Highway No. 69 runs northeast and southwest between Kansas City and Excelsior Springs and north and south between Excelsior Springs and the Missouri-Iowa line.

As thus shown, Traffic Relief Road No. 35 extends from a point southeast of Kansas City, around said city on the east side thereof, to a point north of said city, and connects with or intersects the main highways which enter said city from the north, east and south, and when completed will enable travelers from the north, east and south to skirt said city or to shift from one of said main highways to another

outside of said city, and thereby reduce traffic congestion in said city and in an area adjacent thereto.

Taking notice of the course of the Missouri River north and east of Kansas City, we think there can be no doubt that the State Highway Commission is authorized, by the specific provision for the construction of highways and bridges in the congested areas adjacent to said city, to designate a bridge across the Missouri River between Independence and Liberty as a part of said traffic relief road; if otherwise construed, said provision would, in our opinion, fall far short of the purpose for which it was intended.

And, applying here what we have said with reference to the authority of the State Highway Commission to purchase the toll bridge across the Missouri River at Jefferson City for use as a part of a primary highway, we conclude that the State Highway Commission is authorized to purchase the toll bridge across the Missouri River between Independence and Liberty for use as a part of said traffic relief road; in other words, it is our conclusion that the general provision for the *construction* of "bridges across the rivers and waters of the State" and the specific provision for the *construction* of highways and bridges in the congested traffic areas adjacent to Kansas City should be so construed as to authorize the State Highway Commission to *provide* bridges across navigable streams for use as parts of traffic relief roads, either by the *construction* of new bridges or by the *purchase* of existing bridges.

■ III. THE HERMANN BRIDGE.—The ninth paragraph of the constitutional amendment of 1928 says, in part:

*"In order to connect state highways as designated and laid out under existing law with other such highways or with highways in adjoining states, and also in order to facilitate and expedite the movement of through traffic,* the State Highway Commission is hereby authorized and empowered to locate, *construct,* and maintain from the funds herein provided for construction of primary and secondary highways and from the State Road Fund, *highways and bridges* not exceeding in the aggregate three hundred (300) miles *as a part of and to be added to the said state highway system. . . ."* (Our italics.)

In pursuance of this provision a toll bridge across the Missouri River at Hermann, which now connects the parts of State Highway No. 19 lying north and south of the river, has been designated by the State Highway Commission as a part of the 300 miles of new highways and bridges to be added to the state highway system; and in pursuance of the provisions hereinabove quoted for the construction of new highways and bridges in the congested traffic areas adjacent to St. Louis the State Highway Commission has also designated said

toll bridge as a part of Traffic Relief Road No. 100, which extends from Washington north and west to Hermann, thence across the Missouri River, and thence north on State Highway No. 19 to U. S. Highway No. 40, near New Florence.

State Highway No. 19 is a secondary state highway which, as now designated, extends in a general southerly direction from Hannibal to the north bank of the Missouri River, thence across the Missouri River on a toll bridge to Hermann, and thence in a general southerly direction to the Missouri-Arkansas line, near Thayer. It connects with U. S. Highway No. 36 at Hannibal, follows U. S. Highway No. 61 from Hannibal to New London, connects with State Highway No. 26 near Perry, follows U. S. Highway No. 54 from Laddonia to a point north of and near Martinsburg, intersects U. S. Highway No. 40 at a point south of and near New Florence, follows U. S. Highway No. 50 from Drake to Rosebud, follows State Highway No. 28 from Rosebud to Owensville, intersects U. S. Highway No. 66 at Cuba, connects with State Highway No. 8 at Steelville, intersects State Highway No. 32 at Salem, follows U. S. Highway No. 60 from Winona to Birch Tree, connects with State Highway No. 42 at Alton, and follows U. S. Highway No. 63 from a point north of and near Thayer to the Missouri-Arkansas line.

The parts of State Highway No. 19 lying north and south of the Missouri River are designated in the Centennial Road Law as two different, disconnected state highways, the route followed by State Highway No. 19 from Hannibal to the Missouri River being designated in said law as the route of a highway which terminates at the north bank of the Missouri River, and the route followed by State Highway No. 19 from Hermann to the Missouri-Arkansas line being designated in said law as the route of a highway which begins at Hermann. [Sec. 29, Centennial Road Law, Laws of 1921, 1st Ex. Sess., pp. 151 and 157, now Sec. 8120, R. S. 1929.]

The Hermann bridge is the only bridge across the Missouri River between St. Charles and Jefferson City. As shown by our description of State Highway No. 19, it follows the most direct route between northeast and southeast Missouri, and connects with or intersects all east and west cross-state highways, thereby enabling travelers in the east half of this State to cross the Missouri River on the shortest route between points north and south of the river instead of going around on a longer route and crossing the river at St. Charles or Jefferson City.

The State Highway Commission is expressly authorized to construct 300 miles of additional highways and bridges, obviously in separate pieces, "In order to connect state highways as designated and laid out under existing law with other such highways or with highways

in adjoining states, and also in order to facilitate and expedite the movement of through traffic." Unquestionably a bridge across the Missouri River at Hermann may be designated as a part of said additional highways and bridges, for, as we have seen, such a bridge will not only constitute a connecting link between two state highways designated and laid out in the Centennial Road Law, but will also facilitate and expedite the movement of through traffic.

And, applying again what we have said with reference to the authority of the State Highway Commission to purchase the Jefferson City bridge for use as a part of a primary highway, we conclude . that the State Highway Commission is authorized to purchase the Hermann bridge for the above mentioned purposes; that is to say, it is our conclusion that, under the general provision for "bridges across the rivers and waters of the State" and the specific provision for 300 miles of additional highways and bridges, the State Highway Commission may either *construct* new bridges or *purchase* existing bridges across navigable streams for use as a part of said addition to the state highway system.

In view of these conclusions, it becomes unnecessary for us to determine whether the Hermann bridge may be designated and purchased for use as a part of the so-called Traffic Relief Road No. 100.

It is stated in relator's petition, and not denied in respondent's return, that the total amount to be paid for said toll bridges under the contracts for the purchase thereof is less than one-half of the estimated cost of constructing new bridges across the Missouri River as parts of said designated highways. Be that as it may, the value of said toll bridges to the State is a matter for the State Highway Commission and not for us to determine.

A peremptory writ of mandamus is awarded. *Ragland* and *Ellison, JJ.,* concur; *White, J.,* concurs in result; *Atwood, C. J.,* dissents in separate opinion; *Frank* and *Gantt, JJ.,* dissent and concur in dissenting opinion by *Atwood, C. J.*

ATWOOD, C. J. (dissenting)—Upon full consideration of the majority opinion I find myself in the unhappy role of dissenter.

Relator seeks authority to purchase three intrastate bridges across the Missouri River with funds arising from bonds authorized by an amendment to the Constitution of Missouri adopted November 6, 1928, now Section 44a of Article IV of the Constitution. No such authority expressly appearing in this amendment the majority opinion undertakes to supply it by implication.

The section immediately preceding declares that "the General Assembly shall have no power to contract or to authorize the contracting of any debt or liability on behalf of the State, or to issue bonds or

other evidences of indebtedness thereof," except as therein stated. Section 44a presents an additional exception and specification of indebtedness. Like the exceptions in the preceding section it extends and at the same time delimits the legislative power to create indebtedness and should be construed neither liberally nor strictly but just as written. Its first paragraph authorizes the incurring of this additional indebtedness for three purposes only, to-wit, "locating, establishing. acquiring, constructing, widening and improving hard-surfaced public highways in the State and in each county thereof, and of acquiring materials therefor and for the purpose of locating and constructing bridges across the rivers and waters of the State and of participating in the construction of toll-free, interstate bridges." Highways, intrastate bridges and interstate bridges are thus treated in the amendment itself as distinct purposes, and the only one pertinent to this case is the purpose of "locating and constructing bridges across the rivers and waters of the State."

The majority opinion in effect arbitrarily substitutes the word *providing* for the word *constructing* where the latter appears in the part of the amendment last above quoted, and then treats the clause, thus amplified by substitution, as including authority for either *"constructing* new bridges" or *"purchasing* existing bridges"—a transplanting operation I dare say hitherto untried in the interpretation of constitutions.

The third paragraph of Section 44a provides that proceeds of the sale of the seventy-five million dollars of additional bonds authorized by the amendment shall be expended under the direction and supervision of the state highway commission for the following purposes:

"To complete and widen or otherwise improve the state system of primary and secondary highways as designated and laid out under existing law; to reimburse the various counties and political or civil subdivisions (including road districts) of the State for money expended by them in the construction or acquisition of roads and bridges now or hereafter taken over by the State as permanent parts of the state highway system to the extent of the value to the State of such roads and bridges at the time taken over, not exceeding in any case the amount expended by such counties or subdivisions in the construction or acquisition of such roads and bridges; to construct other state highways and bridges, and to widen or otherwise improve existing state highways and bridges in the congested traffic areas adjacent to the cities of St. Louis and Kansas City; to locate, establish, acquire and construct supplementary state highways and bridges, as hereinafter provided, in each county of the State, in addition to those state highways and bridges designated and laid out under existing law, and to acquire materials therefor."

■ The majority opinion lays great emphasis on the word *complete* as used in the first clause of the paragraph last above quoted. As said by MR. CHIEF JUSTICE MARSHALL in Gibbon v. Ogdon, 9 Wheat. 1, the framers of the Constitution and the people who adopted it "must be understood to have employed words in their natural sense, and to have intended what they have said." [See, also, 6 R. C. L. p. 52, sec. 47.] The natural and ordinary meaning of the word *complete* is, "brought to and end or to a final or intended condition." [Webster's New International Dictionary.] It does not imply a grant of new powers, but rather the continued exercise of old ones in the manner and along the lines already commenced. Such usage and meaning are in absolute harmony with the entire amendment. The purpose therein declared "of locating and constructing bridges across the rivers and waters of the State" is not only adequate to effectuate "the completion of the state highway system." It is obviously declarative of a general policy of "locating and constructing" such bridges by the State, which is inconsistent with the idea of a general power vested in any state agency to purchase or make reimbursement for bridges *already located and constructed.*

■ Where reimbursement is allowed it is clearly confined to "counties and political or civil subdivisions (including road districts) of the State," as indicated in the second clause of the above quoted third paragraph of this amendment. The General Assembly had previously spoken in no uncertain terms on this subject by providing in what is now Section 8139, Revised Statutes 1929 that the State Highway Commission should not "reimburse any county or other organization, or person" for bridges or parts of bridges over navigable streams. Had it been the intention of the framers of this constitutional amendment that the State Highway Commission should be empowered to make such reimbursements to persons or organizations other than counties and political or civil subdivisions of the State then surely in the light of this existing legislation such intention would have been plainly expressed in the amendment. If the power to reimburse for bridges built and subsequently taken over by the State Highway Commission is so hedged about in the amendment, certainly the power to purchase bridges, which is not even mentioned in the amendment, should not be implied. That a power is sometimes, or even generally, desirable is no excuse for lending judicial sanction to its exercise when, as here, it is clearly withheld by clear limitations of the fundamental law.

■ Purchase of the bridge at Jefferson City is specially urged under the allegation in relator's petition (admittedly without application to the other bridges in question) that in 1923, after the passage of the Centennial Road Law, "a highway commencing at Rolla, run-

ning north and west through Jefferson City, crossing the Missouri River on the toll bridge, thence running north and west through Jefferson City, crossing the Missouri River on the toll bridge, thence running north through Columbia to Moberly, was designated as a part of the 1500 miles of higher type roads, provided for in the Centennial Road Law and commonly known as the primary highway system.'' This bridge was then and still is privately owned property, operated under the toll-bridge laws of this State, and is no part of ''the state system of primary and secondary highways as designated and laid out under existing law'' for the *completion* of which the proceeds of bonds' may be used under the provisions of this constitutional amendment. Such highways undoubtedly may be completed out of these funds, to the extent that bridges are necessary to accomplish that purpose, by ''locating and constructing bridges across the rivers and waters of the State,'' but not otherwise.

The majority opinion also apparently relies upon the words ''*acquisition* of roads and *bridges*'' appearing in the second clause of the above quoted paragraph. Their use refutes rather than sustains the position taken in the opinion because it shows that the framers of the amendment had in mind the broader meaning of the word *acquisition* and consciously used it in the second and last clauses of this paragraph, neither of which is applicable to the bridges here in question, but limited the powers conferred in the remaining clauses by entirely omitting it therefrom. This omission from such a detailed piece of legislation is highly significant. It must have been intentional on the part of those who framed and adopted this amendment to the Constitution. Doubtless for reasons appearing good and sufficient to them the amendment was so framed, and we should not judicially sanction the exercise of a power which they have plainly withheld.

As a background for the foregoing and other cited provisions of the amendment which are equally inept, the majority opinion asserts that earlier in the course of highway legislation a dispute arose between the larger cities and the rural districts over a division of ''the spoils,'' and that the larger cities and rural districts subsequently ''got together'' and agreed ''to turn the state highway commission loose'' with ample funds and ample authority for the purpose of completing a system of good roads as speedily as possible. Whether such assertions rest on mere legislative rumor or on historical facts they have no place in a judicial determination of the meaning of this amendment. The existence of this carefully drawn constitutional amendment with its manifold provisions and safe-guards is most convincing proof that the State Highway Commission was not ''turned loose'' to accomplish the purpose mentioned. Even if these assertions pertain to extrinsic circumstances such as in some instances can prop-

**336**

erly be invoked, yet there is no cause to invoke them for the reason that the amendment itself is unambiguous. [Cooley's Const. Law (8 Ed.) p. 141; 12 C. J. p. 704, n. 2.]

We find very few cases holding that "the general power to 'construct' includes the power to 'purchase.'" Chief among them are the three from other jurisdictions cited in the opinion, and even they involve the construction of statutes and municipal ordinances under circumstances in no wise analogous to those here presented. The words *construct* and *purchase* are not synonyms and none of the lexicographers or law writers so hold.

The majority opinion also cites section 8111, Revised Statutes 1929, particularly the second subdivision thereof, as indicative of legislative construction in harmony with the position taken in the opinion. It will be observed at once that this section empowers the highway commission to purchase, lease or condemn *lands* and *not bridges*. Its second subdivision does not even purport to empower the state highway commission to *acquire bridges*. It merely indicates one of the purposes for which *lands* may be purchased, leased or condemned, to-wit, "acquiring bridges . . . over navigable streams, at such places as the State Highway Commission shall have authority to construct, acquire or contribute to the cost of construction of any bridge." At the time this provision was enacted what is now Section 8139, Revised Statutes 1929, was also in force enabling the State Highway Commission to acquire certain bridges across navigable streams "in good repair which may be tendered free and without consideration to the State Highway Commission." The language above quoted from the later statute, section 8111, was obviously used in contemplation of such contingencies as might arise under Section 8139.

From the foregoing and what has previously been said with regard to Section 8139, which was re-enacted in the same form at the revising session in 1929, it is apparent that legislative interpretation of this constitutional amendment is opposed to the position taken in the majority opinion.

It would doubtless be a great convenience and saving to the traveling public using the three bridges here in question if they could immediately become toll-free properties of the State, and it may well be, as suggested by relator and reiterated in the majority opinion, that the purchase of these bridges would result in a great saving of state road funds. But, however, desirable the particular ends here sought may be, it is not within the province of this court to confer powers or to approve the assumption of any power that is beyond limits expressly set by the constitution.

For the reasons hereinabove stated I respectfully dissent. *Gantt* and *Frank, JJ.,* concur.